IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TRUEBEGINNINGS, LLC | § § § | |
| Plaintiff, | § § | |
| VS. | § § | NO. 3-07-CV-1986-M |
| SPARK NETWORK SERVICES, INC., ET AL. | § § § § | |
| Defendants. | § | |

## FINDINGS AND RECOMMENDATION OF THE
## UNITED STATES MAGISTRATE JUDGE

Plaintiff TrueBeginnings, L.L.C. ("True") and Defendants Spark Network Services, Inc. ("Spark") and Niro, Scavone, Haller & Niro, Ltd. ("NSHN") have filed cross-motions for partial summary judgment in this civil action arising out of the alleged unauthorized use of plaintiff's website by NSHN. For the reasons stated herein, defendants' motion should be granted and plaintiff's motion should be denied.

I.

Plaintiff owns an online relationship and dating service operated through its website, http://www.true.com ("True.com"). (*See* Plf. MSJ App. at 23, ¶ 2). Spark is the owner by assignment of U.S. Patent No. 6,272,467 B1 ("the '467 Patent"), entitled "System for Data Collection and Matching Compatible Profiles." (*See id.* at 83-103). NSHN is a Chicago law firm that represents Spark in the licensing and enforcement of the '467 Patent. (*See* Plf. MSJ Resp. App. at 26-27).

On or about February 1, 2007, a user identified as "df220" accessed the True.com website from an IP address assigned to NSHN. (*See* Plf. MSJ App. at 46-47). The user registered an account in the name of "Daniel R. Ferri," and provided a date of birth of March 24, 1984. (*Id.*). It appears that Ferri again accessed the True.com website from the NSHN IP address on March 21, 2007. (*Id.*). This time, Ferri identified himself as "Paul K. Vickrey," but provided the same date of birth of March 24, 1984. (*Id.*). Ferri is a paralegal employed by NSHN. (*See id.* at 81). Vickrey is one of the NSHN attorneys representing Spark in this litigation. (*Id.*). On November 2, 2007, another NSHN employee, Jason Hicks, registered his own account with True.com under the screen name "jhixx24." (*Id.* at 46-47, 81). After gaining access to the website and accepting the Terms of Use, Hicks took screenshots[1] of his computer monitor as part of an investigation to determine whether the "True Compatibility Index" infringes the '467 Patent. (*See id.* at 25, ¶¶ 13-14 & 27-33; Plf. MSJ Resp. App. at 26-27; Def. Reply Br. at 1-2).

In a letter dated November 14, 2007, Raymond P. Niro, Jr., an NSHN attorney, notified plaintiff that the True.com website infringed at least two claims of the '467 Patent. (*See* Plf. MSJ Resp. App. at 26-27; *see also* Plf. Sec. Am. Compl. at 3-4, ¶ 8). Attached to the letter were a series of charts comparing the patent claims to screenshots of the website. (*See* Plf. MSJ Resp. App. at 28-37). The letter advised that Spark had filed a patent infringement action against three other internet dating services--Yahoo, eHarmony, and Match.com--in Illinois federal court, and threatened an "expensive legal confrontation" with plaintiff unless the parties were able to resolve their differences. (*See id.* at 27). Less than two weeks later, on November 27, 2007, plaintiff filed the instant action

---

[1] A "screenshot" is a recorded image of the visible items displayed on a computer monitor. (*See, e.g.* Plf. MSJ App. at 27-33).

against Spark in Texas federal court seeking a declaratory judgment of non-infringement and invalidity as to the '467 Patent. Spark countered by joining plaintiff as a defendant in the Illinois litigation. Plaintiff responded to this "tit-for-tat" by amending its complaint in the Texas lawsuit to include claims against both Spark and NSHN for breach of contract, negligent misrepresentation, violations of federal and Texas computer protection statutes, common law trespass, and declaratory relief. (*See* Plf. Sec. Am. Compl. at 6-10, ¶¶ 28-63). The gravamen of these non-patent claims is that NSHN, acting on behalf of Spark, violated the Terms of Use by accessing the True.com website for the purpose of investigating whether plaintiff infringed the '467 Patent. (*See id.* at 4, ¶ 11).

The non-patent claims are before the court on cross-motions for partial summary judgment.[2] Although the parties move for summary judgment on different grounds, the court has identified three broad issues from the arguments presented: (1) whether NSHN and its client, Spark, breached the Terms of Use by accessing plaintiff's website for the purpose of conducting a pre-suit investigation into possible infringing activity; (2) whether the Terms of Use insulate plaintiff from liability for infringing the '467 Patent and prevent Spark from suing plaintiff for patent infringement in Illinois; and (3) whether plaintiff has sustained any damages resulting from the alleged unauthorized use of its website. The issues have been briefed and argued by the parties, and the motions are ripe for determination.

II.

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The substantive law determines

---

[2] At the request of the parties, the court has stayed the patent claims pending a re-examination of the '467 Patent by the U.S. Patent and Trademark Office. *See* Order, 6/9/08.

which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Where, as here, a case is presented by way of cross-motions for summary judgment, each movant has the burden of producing evidence to support its motion. A movant who bears the burden of proof at trial must establish "beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). A party seeking summary judgment who does not have the burden of proof at trial need only point to the absence of a genuine fact issue. *See Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995). Once the movant meets its initial burden, the burden shifts to the nonmoving party to produce evidence or designate specific facts in the record showing the existence of a genuine issue for trial. *See Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). All evidence must be viewed in the light most favorable to the party opposing the motion. *See Foulston Seifkin LLP v. Wells Fargo Bank of Texas N.A.*, 465 F.3d 211, 214 (5th Cir. 2006).

A.

The threshold issue in this case is whether the pre-suit investigation of plaintiff's website conducted by NSHN falls within the scope of the Terms of Use. Defendants contend that the Terms of Use apply only to the dating and relationship services offered by plaintiff through its website. Plaintiff maintains that the Terms of Use govern any access or use of the website.

1.

Under Texas law, "the interpretation of an unambiguous contract is a question of law for the court to decide by 'looking at the contract as a whole in light of the circumstances present when the contract was entered.'" *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004), *quoting Coker v.*

*Coker*, 650 S.W.2d 391, 394 (Tex. 1983). A contract is unambiguous if it is so worded that it can be given a certain or definite legal meaning or interpretation. *Id., citing National Union Fire Ins. Co. of Pittsburgh v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Conversely, a contract is ambiguous when, after applying established rules of construction, the language of the contract is susceptible to two or more reasonable interpretations or meanings. *Id.; see also American Manufacturers Mutual Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). However, "[a] contract is not ambiguous merely because the parties to an agreement proffer conflicting interpretations of a term." *Gonzalez*, 394 F.3d at 392, *quoting International Turbine Services, Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 497 (5th Cir. 2002). "When a case involves the interpretation of a contract and the contract is unambiguous, summary judgment is appropriate." *Esquivel v. Murray Guard, Inc.*, 992 S.W.2d 536, 544 (Tex. App.--Houston [14th Dist.] 1999, pet. denied).

In construing a written contract, the court's primary concern is to ascertain the true intent of the parties as expressed in the instrument. *Gonzalez*, 394 F.3d at 392; *see also Resolution Trust Corp. v. Cramer*, 6 F.3d 1102, 1106 (5th Cir. 1993). "The terms used in the [contract] are given their plain, ordinary meaning unless the [contract] itself shows that the parties intended the terms to have a different, technical meaning." *Gonzalez*, 394 F.3d at 392, *quoting American National General Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001). Moreover, contracts must be construed in their entirety "so that the effect and meaning of one part on any other part may be determined." *Texas v. American Tobacco Co.*, 463 F.3d 399, 408 (5th Cir. 2006), *quoting Smart v. Tower Land & Investment Co.*, 597 S.W.2d 333, 337 (Tex. 1980). "[C]ourts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section

of a contract." *Id., quoting State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). To the extent possible, the court should "harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Bank One Texas, N.A. v. FDIC*, 16 F.Supp.2d 698, 707 (N.D. Tex. 1998), *citing Coker*, 650 S.W.2d at 393.

2.

The court begins its task of ascertaining the scope of the Terms of Use by examining the layout of the subject website. When a user accesses the True.com homepage, the opening screen displays an image of a young couple locked in a romantic embrace with a headline banner that reads, "Meet the One Who's Right for You--Right Now." (*See* Plf. MSJ App. at 27). Underneath the headline banner, the website advertises, "Whether you're looking for your soul mate--or just a great date--TRUE will help you find exactly what, and who, you're looking for." (*Id.*). The opening screen touts the benefits of True's dating and relationship services, including scientific compatibility testing and background screening to weed out felons and married persons, and invites the user to sign up for a free trial. (*Id.*). Upon clicking the "Sign Up Free" button, the website allows the user to "Search for FREE and contact thousands of singles near you!" (*Id.* at 32). In order to access this free service, the user must provide his or her gender, zip code, and preference for a male or female partner within a certain age range. (*Id.*). Once the user provides this information and clicks the "Continue" button, the screen displays the screen names and photographs of a number of possible matches, covered by a box that asks the user to supply a birth date, screen name, password, email address, and country of residence. (*Id.* at 33). On the bottom of the screen page, the user is warned, for the first time, that "By clicking 'CONTINUE' I affirm that . . . I have read and agree to the TRUE Terms of Use and Code of Ethics." (*Id.*) (emphasis in original).

The Terms of Use are set forth in a seven-page document containing 34 numbered paragraphs. The first paragraph, which defines the scope of the agreement, provides:

> *These Terms of Use*, along with our Code of Ethics, Terms and Conditions, and other applicable rules and guidelines including but not limited to our Privacy and Use Policy (collectively, the "Agreement"), *govern your use of our website and related services (collectively, the "Services")*. Your use of the Service and any materials accessed through the Service indicates your full acknowledgment, understanding, agreement and acceptance of these Terms of Use and the Agreement. As you sign up, please read this Agreement carefully. You can complete your sign-up and become a subscriber only by following the steps below. USAGE CONSTITUTES ACCEPTANCE SO ONCE YOU CLICK ON THE BUTTON AT THE END OF YOUR SIGN-UP FORM, YOU ARE AGREEING TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT AGREE TO ALL THE PROVISIONS CONTAINED IN THIS AGREEMENT, YOU SHOULD NOT USE THE SERVICE. SUBSCRIPTION TO THE SERVICE IS VOID WHERE PROHIBITED.

(*Id.* at 38, ¶ 1) (emphasis added). Thus, by its express language, the Terms of Use apply only to the "Services" provided by plaintiff, which are defined as "use of our website and related services." (*Id.*). In determining whether the term "Services" includes use of the website for any purpose, as argued by plaintiff, or use of website only for accessing dating and relationship services, as argued by defendants, the court looks to the contract as a whole in light of the surrounding circumstances.

According to the True.com homepage, plaintiff provides a variety of online dating services to enable members to find their most compatible matches "for dating, romance, love and more." (*Id.* at 27). Little is left to the imagination of what "more" might entail, as the homepage invites users to take a Sexploration™ test to find their "hottest matches." (*Id.*). Plaintiff also offers "coaching" services to help members prepare their profiles and personal ads, as well as recommendations for safer dating, which the member must review and agree to follow prior to using the Service. (*Id.* at

27 & 42, ¶ 21). Although a third-party advertisement appears on the homepage, (*see id.* at 27), the Terms of Use make clear that plaintiff takes no responsibility for--and has no control over--any content, goods, or services obtained through any such advertiser or third-party resource. (*Id.* at 43-44, ¶¶ 28-29). In light of the nature of the services offered by plaintiff, it is reasonable to conclude that the terms of use apply only to the dating and relationship services available through the True.com website.

Other provisions of the Terms of Use support this conclusion. One such provision is a "Code of Ethics," whereby the user must certify, *inter alia*, that he or she is at least 18 years old, has never been convicted of a felony or a sexual offense, and is not married. (*Id.* at 38, ¶ 5). The user also must agree to maintain any photos posted to his or her profile within two years of the date taken, to truthfully answer questions in the TRUE Compatibility Test® and the TRUE Sexploration® test, to treat fellow members with dignity and respect, and not to use defamatory, abusive, profane, threatening, harassing, or otherwise offensive materials in communications with other members. (*Id.* at 39, ¶ 5). These representations are meaningful only if the website is used to contact and communicate with other members and subscribers for the purpose of developing a personal relationship. In addition, the Terms of Use contain multiple provisions regarding free trials, recurring billing, payment methods, account renewal and termination, and refunds for the services offered. (*Id.* at 41-42, ¶¶ 14-20 & 44, ¶¶ 32-34). These provisions make sense only in the context of plaintiff's business model, which offers online dating and relationship services to members for a fee.

Even the contract provisions plaintiff accuses defendants of breaching can be harmonized with the court's interpretation of the Terms of Use. Specifically, plaintiff accuses defendants of

violating the following terms and conditions:

- to be truthful, accurate and complete in the information presented in his or her Personal Profile (*see* Plf. MSJ App. at 39, ¶ 5);

- to only use the Service for his or her sole, personal use and not authorize others to use the Service or otherwise transfer his or her right to use the Service to any other person or entity (*see id.* at 39, ¶ 7(a));

- to only create one unique profile for the Service provided (*see id.* at 39, ¶ 7(g));

- not to impersonate any person or entity (*see id.* at 39, ¶ 8(a));

- not to use any robot, spider, site search/retrieval application, or other manual or automatic device or process to retrieve, index, 'data mine,' or in any way reproduce or circumvent the navigational structure or presentation of the Service or its contents (*see id.* at 39, ¶ 8(e)); and

- not to modify, adapt, sublicense, translate, sell, reverse-engineer, decipher, decompile or otherwise disassemble any portion of the Service or the website associated with the Service or any software used with or for the Service or cause others to do so (*see id.* at 40, ¶ 8(*l*)).

Plaintiff advertises that it performs background checks on its members to exclude felons and married persons. (*See id.* at 27). Indeed, the website warns that convicted criminals and married persons representing themselves as single will be reported to appropriate law enforcement authorities and prosecuted to the fullest extent of the law. (*Id.*). The provisions requiring users to provide truthful and accurate information, not to impersonate any person or entity, and to create only one unique profile are clearly intended to facilitate plaintiff's background checks and bolster any legal action brought against violators. The requirement that the user only use the Service for his or her "sole, personal use," and not transfer the right of such use to any other person or entity, is intended to

prevent non-members from "piggybacking" on a paying member's account. Although the purpose of the restrictions against "data mining" and "reverse engineering" is less apparent, it is reasonable to conclude that those provisions are intended to prevent members from devising a way to contact and communicate with potential matches other than through the True.com website.[3] Afterall, if a user could contact a potential match directly, there would be no need to pay for a subscription to plaintiff's service.

Finally, plaintiff could have drafted the terms to expressly cover any "access" or "viewing" of its website, but failed to do so. *Compare Ticketmaster L.L.C. v. RMG Techonologies, Inc.*, 507 F.Supp.2d 1096, 1107 (C.D. Cal. 2007) (Terms of Use expressly governed any "access" to or "viewing" of the website); *Greer v. 1-800-Flowers.com, Inc.*, No. H-07-2543, 2007 WL 3102178 at *2 (S.D. Tex. Oct. 3, 2007) (Terms of Use provided that a party "agrees to its terms by accessing any part of the website"). Instead, the Terms of Use govern "use of the website and related services." Significantly, the user is not required to accept the terms before accessing the website. It is only when the user attempts to utilize the website to find potential matches that a link to the Terms of Use appears. Thus, "use of the website" is inextricably intertwined with plaintiff's "related services," and any interpretation of the "use" provision must be read in the context of the dating and relationship "services" offered through the website.

When the Terms of Use are construed in their entirety and in light of the surrounding circumstances, there can be little doubt that the terms and conditions apply only to the dating and

---

[3] Two other provisions of the Terms of Use support such an interpretation. One prohibits the user from including "any telephone numbers, street addresses, last names, URLs, or email addresses in any content, email, chat message or any other communication." (Plf. MSJ App. at 39, ¶ 7(g)). Another condition, which applies to free trials or free memberships, prevents the user from sharing "an email address, instant message address or other similar address with TRUE members or subscribers other than my True email address," and gives plaintiff the right to remove any personal address and replace it with the user's True.com email address. (*Id.* at 40, ¶ 9).

relationship services offered by plaintiff though its website. Because NSHN used the True.com website for the sole purpose of investigating whether plaintiff infringed the '467 Patent, its conduct is outside the scope of the Terms of Use. Accordingly, defendants are entitled to summary judgment on plaintiff's breach of contract claim.[4]

B.

Plaintiff also seeks summary judgment on its claim for declaratory relief involving two disputed provisions of the Terms of Use. The first provision, entitled "Limitation of Liability," reads:

> I UNDERSTAND AND AGREE THAT TRUE WILL NOT BE LIABLE TO ME OR ANY THIRD PERSON FOR ANY DAMAGES OR LOSS WHATSOEVER, WHETHER DIRECT, INDIRECT, GENERAL, COMPENSATORY, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE, ARISING FROM OR RELATING TO MY USE OF THE SERVICE OR MY CONDUCT OR CONDUCT OF ANYONE ELSE OR MY INABILITY TO USE THE SERVICE INCLUDING WITHOUT LIMITATION, DEATH, BODILY INJURY, EMOTIONAL DISTRESS, LOSS OR CORRUPTION OF DATA OR PROGRAMS, SERVICE INTERRUPTIONS AND PROCUREMENT OF SUBSTITUTE SERVICES, AND/OR ANY OTHER DAMAGES RESULTING FROM USE, COMMUNICATIONS OR MEETINGS WITH OTHER USERS OF THE SERVICE OR PERSONS I MEET OR WHO ARE INTRODUCED TO ME THROUGH THE SERVICE EVEN IF TRUE KNOWS OR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY, I UNDERSTAND TRUE'S LIABILITY TO ME FOR ANY CAUSE WHATSOEVER, AND REGARDLESS OF THE FORM OF THE ACTION, WILL AT ALL TIMES BE LIMITED TO THE AMOUNT I PAID TRUE FOR THE SERVICE.

---

[4] The resolution of this issue pretermits consideration of defendants' argument that public policy prohibits any interpretation of the Terms of Use that prevents an attorney from investigating whether a website infringes a patent. (*See* Def. MSJ Br. at 7-8; Def. Reply Br. at 2). Nor is it necessary to decide whether Spark is liable for the actions of its attorneys. (*See* Plf. MSJ & Resp. Br. at 4).

(Plf. MSJ App. at 42, ¶ 22). The second provision addresses jurisdiction, venue, and choice of law:

> I AGREE THAT IF THERE IS ANY DISPUTE ABOUT OR INVOLVING THE SERVICE, BY USING THE SERVICE, THE DISPUTE WILL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO ITS CONFLICT OF LAW PROVISIONS. IF I AM NOT A RESIDENT OF THE STATE OF TEXAS, I AGREE TO PERSONAL JURISDICTION BY AND EXCLUSIVE VENUE IN THE STATE OF TEXAS AND THE U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS. IF I AM A RESIDENT OF THE STATE OF TEXAS, I AGREE TO PERSONAL JURISDICTION AND EXCLUSIVE VENUE IN THE STATE COURTS OF TEXAS.

(*Id.* at 43, ¶ 25). Under plaintiff's interpretation of these contract terms, it is not liable to Spark for infringing the '467 Patent and cannot be sued anywhere other than Texas. The court disagrees.

When read in its entirety, it is clear that the "Limitation of Liability" applies only to damages or loss arising from or relating to the use of plaintiff's online dating services--not to claims for patent infringement. The first sentence of the paragraph states that plaintiff will not be liable for "any damages or loss whatsoever . . . arising from or relating to [the user's] *use of the Service* or [the user's] conduct or conduct of anyone else or [the user's] inability to *use the Service*[.]" (*Id.* at 42, ¶ 22) (emphasis added). Another part of the same sentence clarifies that the limitation applies to "damages resulting from use, communications or meetings with other users *of the Service* or persons [the user] meet[s] or who are introduced to [the user] *through the Service*[.]" (*Id.*) (emphasis added). As previously discussed, the contract defines "Services" as "use of our website and related services." (*Id.* at 38, ¶ 1). Because plaintiff does not offer patent-related services through its website, the limitation on damages does not apply to patent claims. Nor does the venue provision, which requires "any dispute *about or involving the Service*" to be brought in a Texas court, apply to a suit for patent

infringement. (*Id.* at 43, ¶ 25) (emphasis added). Plaintiff is not entitled to a declaratory judgment with respect to these contract provisions.

C.

Defendants move for summary judgment with respect to plaintiff's other claims on the ground that there is no evidence of damages resulting from the alleged unauthorized use of the True.com website. Damages are an essential element of plaintiff's claims for negligent misrepresentation, violations of the federal and Texas computer protection statutes, and common law trespass. *See, e.g. Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (essential element of negligent misrepresentation is that "the plaintiff suffer[ ] pecuniary loss by justifiably relying on the representation"); *Southwest Airlines Co. v. BoardFirst, L.L.C.*, No. 3-06-CV-0891-B, 2007 WL 4823761 at *12 (N.D. Tex. Sept. 12, 2007), *citing* 18 U.S.C. § 1030(g) (federal Computer Fraud and Abuse Act authorizes civil action for compensatory damages or other relief by a person who suffers "damage or loss"); *Id.* at *16, *citing* TEX. CIV. PRAC. & REM. CODE ANN. § 143.001(a) (Texas statute prohibiting harmful access to computer requires proof of an "injury" to person or property); *Southwest Airlines Co. v. Farechase, Inc.*, 318 F.Supp.2d 435, 442 (N.D. Tex. 2004), *quoting Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201 (Tex. 1981) (liability for common law trespass does not attach "unless the wrongful detention is accompanied by actual damages to the property or deprives the owner of its use for a substantial period of time").

Here, plaintiff fails to allege, much less prove, that it sustained any damages when NSHN accessed its website under false pretenses.[5] Without evidence of damages, plaintiff cannot raise a

---

[5] The only evidence in the record that even remotely touches on the issue of damages is an answer to an interrogatory asking plaintiff to compute the monetary damages it seeks for each cause of action. (*See* Def. MSJ App. at 9, Interrog. #1). In response, plaintiff, through counsel, answered that it "claims costs of $6,450 for its investigation

-13-

genuine issue of material fact to defeat summary judgment on its claims for negligent misrepresentation, violations of the federal and Texas computer protection statutes, and common law trespass.

## **RECOMMENDATION**

Defendants' motion for partial summary judgment [Doc. #59] should be granted and plaintiff's motion for partial summary judgment [Doc. #61] should be denied. The court should dismiss with prejudice plaintiff's claims for breach of contract, negligent misrepresentation, violations of the federal and Texas computer protection statutes, and common law trespass, as well as plaintiff's claim for declaratory relief with respect to the limitation of liability and venue provisions of the Terms of Use. Because the only other claims before the court have been stayed pending a re-examination of the '467 Patent, the court should find that there is no just reason for delay and direct the clerk to enter a final judgment in favor of defendants with respect to the claims dismissed herein. *See* FED. R. CIV. P. 54(b).

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party may file written objections to the recommendation within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). The failure to file written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon

---

into Defendants' illegal access to its website." (*Id.* at 11). However, plaintiff cannot rely on its own interrogatory answers, which are not made under oath by someone with personal knowledge, to create a genuine issue of material fact for trial. *See Bitsoff v. City of Dallas*, No. 3-98-CV-1262-BD, 1999 WL 222452 at *3 (N.D. Tex. Apr. 8, 1999), *aff'd*, 199 F.3d 438 (Table), 1999 WL 1067621 (5th Cir. Oct. 19, 1999) (party may rely on its own interrogatory answers to defeat summary judgment only to the extent the answers otherwise comply with requirements of Rule 56).

-14-

grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: March 13, 2009.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE